## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| CYNTHIA MORRIS,<br>    PLAINTIFF, | §<br>§<br>§ | |
| VS. | § | CIVIL ACTION NO. 4:11-CV-631-Y |
| | § | |
| MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY,<br>    DEFENDANT. | §<br>§<br>§ | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE
### AND
### NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions, and Recommendation

of the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

### I. STATEMENT OF THE CASE

Plaintiff Cynthia Morris ("Morris") filed this action pursuant to Sections 405(g) and

1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying her claims for disability insurance benefits ("DIB")

under Title II of the Social Security Act ("SSA"). Holmes applied for DIB on September 1,

2008, alleging that her disability had begun on November 2, 2007. (Tr. 42, 88.)

After her application for benefits was denied initially and on reconsideration, Morris

requested a hearing before an administrative law judge ("ALJ"). (Tr. 42–43, 58–59.) The ALJ

held a hearing on February 8, 2010, and issued an unfavorable decision on March 25, 2010. (Tr.

10–25.) On July 12, 2011, the Appeals Council denied Morris' request for review, leaving the

ALJ's decision as the final decision of the Commissioner in this case.  (Tr. 1–5.)  Morris subsequently filed this civil action seeking review of the ALJ's decision.

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, of the SSA and numerous regulatory provisions. *See* 20 C.F.R. Pt. 404 (2012).  The SSA defines a "disability" as a "medically determinable physical or mental impairment" lasting at least twelve months that prevents the claimant from engaging in "any substantial gainful activity."  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. § 404.1520(a)(4).  First, the claimant must not be presently working at any substantial gainful activity.  20 C.F.R. § 404.1520(b).  "Substantial gainful activity" is defined as work activity "that involves doing significant physical or mental activities . . . for pay or profit."  20 C.F.R. § 404.1572.  Second, the claimant must have an impairment or combination of impairments that is severe.  20 C.F.R. § 404.1520(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000).  Third, disability will be found if the impairment or combination of impairments meets or equals an impairment contained in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1.  20 C.F.R. § 404.1520(d).  Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.  20 C.F.R. § 404.1520(f).  And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).

Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the most the claimant can still do notwithstanding his physical and mental limitations. 20 C.F.R. § 404.1520(a)(4). The claimant's RFC is used at both the fourth and fifth steps of the sequential analysis. *Id.* At step four, the claimant's RFC is used to determine if the claimant can still do his past relevant work. *Id.* § 404.1520(e). At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.* At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

### III. ISSUES

Morris presents the following issues:

1.  Whether the Commissioner properly considered all of Morris' severe impairments and associated limitations in determining Morris' RFC;

2.  Whether the Commissioner's RFC determination is supported by competent medical findings or opinion evidence; and

3.  Whether the Commissioner properly evaluated Morris' credibility.

(Pl.'s Br. at 1–2.)

### IV. ALJ DECISION

In his March 25, 2010 decision, the ALJ concluded that Morris was not disabled within the meaning of the SSA. (Tr. 13.) In making his determination, the ALJ proceeded to follow the five-step sequential evaluation process. At the first step, the ALJ found that Morris had not engaged in any substantial gainful activity since November 2, 2007—the original alleged onset date of Morris' claimed disability.[1] (Tr. 15.) At the second step, the ALJ found that Morris had "the following severe impairment: status post fusion at C4-5 and C5-6 August 2001." (Tr. 15.) At the third step, the ALJ found that Morris did not have an impairment or combination of impairments that meets or medically equals one of the impairments on the Listing. (Tr. 16.) The ALJ then assessed Morris' RFC and found that she could perform light work as defined by 20 C.F.R. § 404.1567(b), with the following limitations: "no climbing, crawling, kneeling, squatting; occasional stooping, crouching; no constant use of the hands; and the option to sit/stand while performing only noncomplex job duties." (Tr. 18.)

Next, at the fourth step, the ALJ found that Morris was unable to perform any of her past relevant work as a dry cleaning employee, a home inspector, or a press operator. (Tr. 20.)

---

[1] In a prehearing brief, Morris had requested leave to amend the alleged onset date to July 31, 2007. (Tr. 166.) However, the ALJ's decision still used November 2, 2007, as the alleged onset date. (Tr. 15.)

4

Finally, at the fifth step, the ALJ opined that, based on Morris' RFC and on her age, education, and work experience, Morris could perform jobs that exist in significant numbers in the national economy and, thus, was not disabled and had not been disabled at any time through the date of the decision.  (Tr. 20–21.)

## V. DISCUSSION

### A. Severe Impairments

#### 1. Fifth Circuit's Severity Standard

In her first issue, Morris claims that the ALJ failed to use the required severity standard of *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985), in analyzing the severity of her impairments at step two.  To evaluate whether a claimant's medical condition qualifies as a "severe impairment" at step two of the analysis, the Commissioner has issued regulations that define a "severe impairment" as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c); *cf. id.* § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

The Fifth Circuit, however, has held that a literal application of that definition is inconsistent with the statutory language and legislative history of the SSA.  *See Stone*, 752 F.2d at 1104–05. Instead, the Fifth Circuit has established the following standard for determining whether a claimant's impairment is severe: An impairment is not severe only when it is a "slight abnormality" having "*such minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Id.* at 1101 (emphasis added).  The *Stone* severity standard does not allow for *any* interference with work ability, not even minimal interference. *See Scroggins v. Astrue*, 598 F. Supp. 2d 800,

805 (N.D. Tex. 2009) ("*Stone* provides no allowance for a minimal interference on a claimant's ability to work.").

Most courts in this district have repeatedly held that severity standards that deviate from the specific *Stone* language do not comply with the requisite standard set forth in *Stone*. *See, e.g., Scott v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-0152-BF, 2012 WL 1058120, at *7 (N.D. Tex. Mar. 29, 2012) (Stickney, Mag. J.) ("An ALJ's referral to applicable social security regulations and rulings . . . does not substitute as a proper construction of the *Stone* standard."); *Brown v. Astrue*, No. 3:11-CV-0475-BD, 2012 WL 652034, at *3 (N.D. Tex. Feb. 29, 2012) (Kaplan, Mag. J.) (observing that the ALJ "stated that an impairment was not severe 'when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work[,]' . . . thus suggesting that some interference with the ability to work was permissible."); *Ramos v. Astrue*, No. 3:10-CV-1495-BD, 2011 WL 2469582, at *3–4 (N.D. Tex. June 21, 2011) (Kaplan, Mag. J.); *Craaybeek v. Astrue*, No. 7:10-CV-054-BK, 2011 WL 539132, at *6 (N.D. Tex. Feb. 7, 2011) (Toliver, Mag. J.); *Charlton v. Astrue*, No. 3:10-CV-056-O, 2010 WL 3385002, at *7 (N.D. Tex. July 14, 2010) (Ramirez, Mag. J.), *adopted in* 2010 WL 3385000 (N.D. Tex. Aug. 26, 2010) (O'Connor, J.); *Roberson v. Astrue*, 3:10-CV-0240-BH, 2010 WL 3260177, at *10 (N.D. Tex. Aug. 17, 2010) (Ramirez, Mag. J.); *Tusken v. Astrue*, No. 4:08-CV-657-A, 2010 WL 2891076, at *8 (N.D. Tex. May 25, 2010) (Cureton, Mag. J.), *adopted in* 2010 WL 2891075 (N.D. Tex. July 20, 2010) (McBryde, J.); *Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3–4 (N.D. Tex. Jan. 26, 2010) (Kaplan, Mag. J.); *Ruby v. Astrue*, No. 3:08-CV-1012-B, 2009 WL 4858060, at *7–8 (N.D. Tex. Dec. 14, 2009) (Boyle, J.); *Scroggins v. Astrue*, 598 F. Supp. 2d at 805–07 (Lindsay, J.); *Sanders v. Astrue*, No. 3:07-CV-1827-G,

2008 WL 4211146, at *7 (N.D. Tex. Sept. 12, 2008) (Fish, J.). *But see Sinayi v. Astrue*, No. 3:11-CV-2770-D, 2012 WL 3234414, at *3 (N.D. Tex. Aug. 9, 2012) (Fitzwater, C.J.) (holding that a severity standard defining a nonsevere impairment as one "that would have no more than a minimal effect on an individual's ability to work" complies with *Stone*); *Lopez v. Astrue*, No. 4:10-CV-921-A, 2012 WL 1207393, at *7 (N.D. Tex. Mar. 8, 2012) (McBryde, J.) (same).

As to the issue of whether the ALJ applied the appropriate severity standard, courts are to presume that the ALJ used an incorrect standard for measuring severity at step two of the sequential evaluation process if the decision fails to refer to the *Stone* opinion by name or cite language of the same effect. *See Loza*, 219 F.3d at 393. While a case will not be remanded simply because the ALJ did not use "magic words," remand is required when there is no indication that the ALJ applied the correct standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986); *see also McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 835 (N.D. Tex. 2008) (indicating that the Fifth Circuit's remand mandate in *Stone* left lower courts with no discretion to conduct "harmless error" analysis to determine if remand was proper when the ALJ failed to apply the *Stone* severity standard). The ALJ's failure to apply the *Stone* standard is a legal error, not a procedural error, and the claim must be remanded for reconsideration unless the correct standard is used. *Stone*, 752 F.2d at 1106. In other words, if the ALJ fails to apply the *Stone* standard by (1) stating the appropriate standard, (2) citing to *Stone*, or (3) making clear in the decision that the ALJ applied the correct *Stone* standard, remand is required, and the Court cannot engage in a "harmless error" analysis.

### 2. ALJ's Application of a Severity Standard in the Present Case

Citing the regulations and Social Security Rulings, the ALJ first stated in his opinion that an impairment is severe "if it significantly limits an individual's ability to perform basic work

activities." (Tr. 14.) The ALJ then stated that an impairment is not severe "when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (Tr. 14.) The ALJ then proceeded to follow the five-step procedure and analyzed the severity of Morris' cervical fusion, carpal tunnel surgery, and mood disruption due to experiencing somatic pain.

The ALJ first found that Morris' cervical fusion was severe but that her carpal tunnel syndrome was not severe as follows:

> **2. The claimant has the following severe impairment: status post fusion at C4-5 and C5-6 August 2001. (20 CFR 416.920(c)).**
>
> Since the evidence establishes that this medically determinable impairment would have *more than a slight effect* on her ability to work, I find her impairments [sic] are severe. Although the claimant is status post bilateral carpal tunnel releases, she has no impairment reflected of this condition and as such this condition is non severe.

(Tr. 15) (emphasis added). The ALJ then analyzed Morris' mood disruption and found that it was not severe as follows:

> Thus, I find the record is absent documentation of a medically determinable mental impairment that would cause more *than [a] minimal limitation* in the claimant's ability to perform basic mental work activities. . . .
>
> . . . Because the record establishes the claimant has no medically determinable mental impairment, her self-reported somatic symptoms are determined to be nonsevere. Bowen v. Yuckert, 482 U.S. 137 (1987); Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985); ( [sic] 20 CFR 404.1520a(d)(1); SSR 96-3p.

(Tr. 16) (emphasis added). Morris argues that the ALJ did not properly recite the Fifth Circuit's severity standard and, therefore, erroneously failed to find her additional impairments of 1) chronic lumbar myofascial pain, 2) disc protrusion at the C3-4 and C6-7 levels of the cervical spine with spondylosis, and 3) bilateral cervical radiculitis to be severe. (Pl.'s Br. 8.)

Here, the ALJ specifically cited *Stone* in the final portion of his step two analysis. (Tr. 16.) However, earlier in his decision, the ALJ recited a regulatory definition of severity that the Fifth Circuit in *Stone* specifically rejected. Furthermore, the ALJ stated that Morris' cervical fusion "would have *more than a slight effect* on her ability to work" and that Morris did not have a mental impairment causing "*more than [a] minimal limitation* in the claimant's ability to perform basic mental work activities." (Tr. 15–16) (emphasis added). In this way, the ALJ was less than clear in his language regarding the severity standard he employed in this case.

As stated above, the *Stone* severity standard does not allow for *any* interference with work ability, not even minimal interference. In this case, however, the ALJ's cited severity-standard language could require at least a "minimal effect" on work ability before a severe impairment can be found. Therefore, even though the ALJ cited *Stone*, his simultaneous citation to and application of other incorrect severity-standard language creates ambiguity. *See Neal v. Comm'r of Soc. Sec. Admin.*, No. 3:09-CV-522-N, 2009 WL 3856662, at *1 (N.D. Tex. Nov. 16, 2009) (Godbey, J.) ("Even though citation to *Stone* may be an indication that the ALJ applied the correct standard of severity, nowhere does *Stone* state that the ALJ's citation to *Stone*, without more, conclusively demonstrates that he applied the correct standard."). Furthermore, the ALJ did not specifically mention Morris' lumbar pain, cervical disc protrusions, or bilateral cervical radiculitis in his step two analysis.

It is well-established law that a case will not be remanded simply because the ALJ did not use "magic words," and the undersigned has recommended to affirm when an ALJ has cited conflicting severity standards but the decision as a whole makes clear that the ALJ did, in fact, use the appropriate severity standard. *See Andrade v. Astrue*, No. 4:11-CV-318-Y, 2012 WL 1106864, at *8 (N.D. Tex. Feb. 13, 2012) (reviewing the ALJ's employment of the mental

impairment "technique"), *adopted in* 2012 WL 1109476 (N.D. Tex. Apr. 2, 2012); *Martinez v.*

*Astrue*, No. 4:10-CV-883-Y, 2011 WL 3930219, at *7 (N.D. Tex. Aug. 18, 2011) (same),

*adopted in* 2011 WL 3930216 (N.D. Tex. Sept. 7, 2011).  In addition, one recent decision in this

district held that even when the ALJ cited only the severity standard in the regulations without

mentioning *Stone* or otherwise acknowledging the proper construction of the regulations, the

ALJ's decision nevertheless properly analyzed the claimant's impairment because the results of

the claimant's psychological evaluation were "entirely consistent" with a *Stone* finding of

nonseverity and because there was "absolutely no evidence" that emotional distress rendered the

claimant unable to work.  *Taylor v. Astrue*, No. 3-10-CV-1158-O-BD, 2011 WL 4091506, at *7

(N.D. Tex. June 27, 2011) (Kaplan, Mag. J.), *adopted in* 2011 WL 4091503 (N.D. Tex. Sept. 14,

2011) (O'Connor, J.), *aff'd*, No. 11-11085, 2012 WL 2526921 (5th Cir. June 28, 2012).

In addition, if the ALJ's decision as a whole reveals that the ALJ considered an

impairment to have an effect on a claimant's ability to work, a finding of severity is implied and

the *Stone* standard is inferentially applied.

> [E]ven in those cases where the ALJ does not explicitly find an impairment to be
> severe, a *Stone* error is not reversible if the ALJ proceeded beyond the second
> step of the five-step analysis in analyzing the claimant's impairments, thereby
> allowing the district court to *infer* that the ALJ found the impairment severe. In
> other words, the district court properly can draw this *inference* where the ALJ
> considers *the impairments in question* at later stages of the five-step sequential
> analysis, which stages are premised on a finding at the second step of the analysis
> that the impairments were severe.

*Gutierrez v. Astrue*, No. 3:11-CV-500-N, 2011 WL 5921514, at *7 (N.D. Tex. Nov. 23, 2011)

(Toliver, Mag. J.) (emphasis added), *adopted in* 2011 WL 6129600 (N.D. Tex. Dec. 9, 2011)

(Godbey, J.).[2]  In short, a court may infer that the ALJ applied the proper severity standard if the

---

[2] *See also Jones v. Astrue*, 821 F. Supp. 2d 842, 849–51 (N.D. Tex. 2011) (Toliver, Mag. J.) (holding that
the ALJ's failure to apply the correct legal standard under *Stone* at step two "is not grounds for reversal because the
ALJ proceeded beyond step two in the sequential analysis in discussing [and analyzing] the[] impairments [in

ALJ implicitly finds the impairment in question severe and considers **such** impairment in later stages of the sequential analysis. This inference may be drawn because the ALJ's implicit finding of severity indicates that the ALJ determined, consistent with the *Stone* standard, that the impairment in question had some effect on the claimant's ability to work and, thus, was severe.[3] Accordingly, the Court must examine the ALJ's decision with regard to each of Morris' claimed impairments that the ALJ did not explicitly find to be severe—her cervical disc protrusions with spondylosis, bilateral cervical radiculitis, and chronic lumbar myofascial pain—to determine whether the ALJ actually applied the *Stone* standard that he cited at the end of his step two analysis with regard to these impairments in question.

### a. Cervical Impairments

Morris alleges that, while the ALJ found her cervical fusion at C4-5 and C5-6 to be a severe impairment, he did not consider the other problems with her cervical spine: disc protrusion at the C3-4 and C6-7 levels of the cervical spine with spondylosis,[4] and bilateral

---

question]"); *cf. Abernathy v. Astrue*, No. 7:11-CV-116-O, 2012 WL 2423106, at *4–8 (N.D. Tex. May 15, 2012) (Roach, Mag. J.) (holding that the ALJ's failure to cite *Stone* required remand as to the mental impairment in question because the ALJ did not properly evaluate it under the "special technique" of mental-impairment evaluations and did not consider any limitation arising from the mental impairment at any subsequent step in the analysis), *adopted in* 2012 WL 2458059 (N.D. Tex. June 27, 2012) (O'Connor, J.); *Lederman v. Astrue*, 829 F. Supp. 2d 531, 539–40 (N.D. Tex. 2011) (Lynn, J.) (remanding for ALJ's failure to apply the correct severity standard because the ALJ did not find the impairment in question as severe at step two and failed to address it later on in the sequential analysis); *Holman v. Astrue*, No. 2:06-CV-0238, 2009 WL 3047418, at *4 (N.D. Tex. Sept. 23, 2009) (Robinson, J.) ("In a multi-impairment case, proceeding past step two on impairments found to be severe, but not proceeding past step two on the impairment or impairments found not severe, does not cure any error which may have occurred."); *Odstrcil v. Astrue*, No. 1:08-CV-106-C, 2009 WL 3048369, at *5–6 (N.D. Tex. Sept. 24, 2009) (Lane, Mag. J.); *Bradshaw v. Astrue*, No. 1:07-CV-0150-C, 2008 WL 4387087, at *6 (N.D. Tex. Sept. 26, 2008) (Lane, Mag. J.). In other words, the failure to cite to *Stone* or recite the correct severity standard is not an error because, based on the ALJ's analysis beyond step two of the impairments in question, it is clear that the ALJ applied the correct legal standard.

[3] While it may seem to be a fine line, the conclusion that the ALJ implicitly found alleged impairments severe by considering such impairments in later stages of the five-step analysis is not the same as conducting a "harmless error" analysis—it is a conclusion that no error occurred since the *Stone* severity standard has been, albeit implicitly, applied by the ALJ.

[4] Spondylosis is a medical term for stiffening of the vertebra, "often applied nonspecifically to any lesion of the spine of a degenerative nature." *Spondylosis, in Stedman's Medical Dictionary* (27th ed. 2000), *available at* STEDMANS 382100 (Westlaw).

cervical radiculitis.[5]  (Pl.'s Br. 8.)  The ALJ noted in his discussion of the medical evidence that

in September 2009, another treating physician, neurological surgeon Dr. Jacob Rosenstein ("Dr.

Rosenstein"), ordered x-rays and a CT scan of Morris' cervical spine to view her fusion as well

as the discs above and below the fusion. (Tr. 18, 229.)  The ALJ observed that the films showed

disc protrusions at C3-4 and C6-7, with disc space narrowing and spondylosis at C6-7.[6]  (Tr. 18)

Morris told Dr. Rosenstein at her September 28, 2009 exam that she had "constant neck pain"

and "stabbing pain that radiates into her arms," as well as "numbness in her arms." (Tr. 228.)

Dr. Rosenstein noted patchy hypesthesia over both hands.[7]  (Tr. 229.)

At her November 2, 2009 exam with Dr. Rosenstein, Morris reported that her neck pain

affected her arms and hands as follows:

> She has pain that radiates down into both shoulders and down into the
> interscapular area.  She reports that her pain is greater on the right than on the left.
> She has pain with numbness that radiates down into the thumb and index finger
> on the right hand and into the index finger on the left hand.  She states however
> that the numbness is actually worse on the left.

(Tr. 232.)  Dr. Rosenstein noted diffuse hypoesthesia[8] over both hands.  He diagnosed Morris

with disc narrowing and anterolisthesis at C6-7, disc protrusion at C6-7 and C3-4, and status post

cervical fusion.  (Tr. 233.)  The ALJ noted that Morris reported at this exam that "the medical

---

[5] Radiculitis is inflammation of the spinal nerve roots. *See Radiculitis, in Stedman's Medical Dictionary* (27th ed. 2000), *available at* STEDMANS 347550 (Westlaw).

[6] Specifically, the ALJ explained that "[the] Davis series [x-rays] showed a solid fusion at C4-5 and C5-6 with an ABC plates, disc space narrowing and spondylosis at C6-C7.  The CT scan of the cervical spine showed diffuse central C3-4 protrusion abutting the spinal cord with spondylosis at C6-7 and small right C6-7 protruding discs." (Tr. 18.)

[7] Hypesthesia is "[d]iminished sensitivity to stimulation." *Hypesthesia, in Stedman's Medical Dictionary* (27th ed. 2000), *available at* STEDMANS 193930 (Westlaw).

[8] Hypoesthesia is a synonym for hypesthesia. *Hypoesthesia, in Stedman's Medical Dictionary* (27th ed. 2000), *available at* STEDMANS 195030 (Westlaw).

regime established by the pain management specialist helped to control her pain: i.e., Etodolac, Hydrocodone, Flexeril, and Lidoderm patches."[9]  (Tr. 18, 232.)

The ALJ's decision discussed Dr. Rosenstein's records from his December 2009 examination of Morris, in which Dr. Rosenstein reported that Morris had 5/5 motor strength in all major muscle groups and no myleopathy.  (Tr. 18, 236.)  Morris' range of motion of her cervical spine was forward flexion of 35 degrees, extension 30 degrees, lateral flexion to right and left 15 degrees, and rotation to right and left 60 degrees.  (Tr. 18, 236.)  Dr. Rosenstein also found patchy hypesthesia[10] in upper extremities bilaterally.  (Tr. 18, 236.)  Dr. Rosenstein diagnosed Morris with bilateral cervical radiculitis, and he repeated his diagnoses of C3-4 disc protrusion, C6-7 disc protrusion with spondylosis, and C6-7 disc space narrowing and anterolisthesis.  (Tr. 236.)  The ALJ noted that, at this exam, Morris "reported wanting to change her pain medications (citing her current pain medications were no longer working), and she was given a trial of Darvocet-N 100 to take as needed and Relafen and Parafon Forte for spasms."  (Tr. 18, 237.)

Morris complains that the ALJ did not consider any limitations in her range of motion of her cervical spine.  (Pl.'s Br. 11, Pl.'s Reply 3.)  However, the ALJ assessed significant limitations resulting from Morris' cervical impairments in her RFC by limiting her to light work with the additional restrictions of "no climbing, crawling, kneeling, squatting; occasional stooping, crouching; no constant use of the hands; and the option to sit/stand while performing only noncomplex job duties."  (Tr. 18.)  By assessing these limitations, the ALJ clearly considered Morris restricted in her range of motion.  Furthermore, the ALJ specifically included

---

[9] Morris stated to Dr. Rosenstein that without medications, her pain rated "12/10 on the pain scale," but with medication, her pain decreased to "6–7/10 on the pain scale."  (Tr. 232.)

[10] The ALJ's decision stated that Dr. Rosenstein found "patchy hyperthesia" (Tr. 18), but this appears to be a typographical error because the medical records from this exam show "patchy hypesthesia" (Tr. 236).

in Morris' RFC a limitation relating to use of the hands—a limitation that she recognizes is linked to her additional cervical impairment of disc protrusions with spondylosis.[11] (Pl.'s Br. 11–12.)

By including this limitation on the use of Morris' hands, it is clear that the ALJ determined that Morris' disc protrusions with spondylosis (an impairment in question) affected her ability to work—i.e., were severe.   Indeed, a nonsevere impairment would not merit a limitation in the RFC assessment because a nonsevere impairment would not have any effect on a claimant's ability to work.   Accordingly, the Court can infer, from the ALJ's discussion of Morris' disc protrusions with spondylosis and upper-extremity numbness and pain after step two of the analysis, as well as the ALJ's incorporation of a hand-use limitation in the RFC assessment, that the ALJ implicitly found the disc protrusions to be severe.   *See Gutierrez*, 2011 WL 5921514, at *7; *Jones*, 2011 WL 4498872, at 5–7.   From this, the Court can also infer that the ALJ properly applied the *Stone* severity standard in his consideration of Morris' impairments.[12]

### b.   Chronic Lumbar Myofascial Pain

Having found inferentially that the ALJ properly applied the *Stone* standard in evaluating the cervical impairments hereinabove, the Court now considers whether the ALJ erred in not explicitly listing Morris' chronic lumbar myofascial pain as a severe impairment.   In the ALJ's discussion of the medical evidence, the ALJ observed that Morris' treating physician, pain

---

[11] Morris recognizes this link by asserting that the ALJ may have determined that her use of her hands was significantly more limited had he "properly considered the evidence of disc protrusion with disc material touching the spinal cord and cervical spondylosis." (Pl.'s Br. 11–12.)

[12] As for Morris' bilateral cervical radiculitis, Morris does not identify any additional limitations on her ability to work beyond those already imposed by her other cervical impairments, and she does not explain how this specific impairment interfered with her ability to work.   Accordingly, Morris has likewise failed to show that the ALJ erred in his application of the *Stone* standard to evaluate the severity of her bilateral cervical radiculitis. *See Stone*, 752 F.2d at 1101.

management specialist Dr. Susan K. Linder ("Dr. Linder"), had diagnosed Morris with "[c]hronic lumbar myofascial pain, stable" on November 17, 2005. (Tr. 16–17, 177.) Dr. Linder's examination revealed mild tenderness through the lumbar paraspinals, with no sciatic notch tenderness. (Tr. 17, 177.) Although lumbar range of motion was moderately decreased in all planes with pain on end range, Morris had no focal neurological deficits relating to her lower extremities. (Tr. 17, 177.) Dr. Linder noted that Morris was working part-time jobs as a real estate inspector and a dry cleaning employee and recommended that Morris continue those work activities as well as her home exercise program. (Tr. 17, 176–77.)

Several times in 2006 and 2007, Dr. Linder examined Morris and reported a "functional" and "well preserved" lumbar range of motion, with no tenderness, trigger point, or muscle spasm in the lumbosacral paraspinals, hip, and buttock areas and no focal neurological deficits in the lower extremeties. (Tr. 178–79, 180–81, 182–183, 184–85, 186–87.) Throughout this time period, Dr. Linder continued to recommend that Morris continue her work activities as well as her home exercise program. (Tr. 179, 181, 183, 185, 187.)

The ALJ noted that Dr. Linder changed Morris' medication regimen on October 22, 2007, in accordance with a peer review finding that some of her medications (i.e., trazodone, Flexeril, and Effexor) were not supported by official disability guidelines and that she should be weaned off these medications. (Tr. 17, 186–87.) On March 24, 2008, Morris reported to Dr. Linder that she had experienced increased pain since changing her medications and could no longer work at her part-time jobs. (Tr. 17, 188.) Dr. Linder's examination revealed moderate tenderness throughout the lower lumbar paraspinals, hip, and buttock areas; functional range of motion throughout her lower back with pain on end range; and no focal deficits. (Tr. 17, 189.) Dr. Linder diagnosed Morris with "chronic lumbar myofascial pain, with intermittent pain

flares." (Tr. 191.) Examinations by Dr. Linder on August 25, 2008, and March 9, 2009, reported the same findings and diagnosis relating to Morris' lower back. (Tr. 190–91, 194–95.)

A mere diagnosis of an impairment is not sufficient to establish a severe impairment. *See Ranes v. Astrue*, No. 3:08-CV-2030-D, 2009 WL 2486037, at *3 (N.D. Tex. Aug. 14, 2009) (citing *Randall v. Astrue*, 570 F.3d 651, 657–59 (5th Cir. 2009)) ("[T]he question of the existence of a medically determinable impairment is distinct from, and logically antecedent to, the question of its severity."). At step two, the claimant bears the burden of proving not only that she has been diagnosed with a medically determinable impairment but also that it affects her ability to work. *See Crowley*, 197 F.3d at 198.

Morris complains that the ALJ failed to consider any functional limitations resulting from her chronic lumbar myofascial pain. She cites medical records showing "tenderness" in the lumbar area, but she does not point to any record evidence of any *functional* limitations relating to her lower back other than one medical record notation by Dr. Linder stating that her lumbar range of motion was "moderately decreased" in November 2005. (Pl.'s Br. 8, 11; Pl.'s Reply 2.) But in this same November 2005 record, Dr. Linder stated that she had only "mild tenderness" in the lumbar region and no focal deficits in the lower extremities. (Tr. 177.) And even with this lumbar range of motion that was "moderately decreased," Dr. Linder recommended that Morris continue working her part-time jobs as a real estate inspector and a dry cleaning employee. (Tr. 176–77.)

Otherwise, throughout the period of alleged disability, the medical records show that Morris had a functional lumbar range of motion with no focal neurological deficits. While Dr. Linder diagnosed Morris with lumbar "pain flares" as of March 2008, Dr. Linder characterized them as "intermittent." Thus, the medical records relating to Morris' lumbar impairment support

the ALJ's decision not to list her lower back pain as a separate severe impairment under the *Stone* standard. *See Stone*, 752 F.2d at 1101 (stating that an impairment is not severe only when it is a "slight abnormality" having "such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work"); *see also Taylor*, 2011 WL 4091506, at *7 (holding that, even without a citation to *Stone*, the ALJ's decision properly analyzed the claimant's impairment because the results of claimant's psychological evaluation were "entirely consistent" with a *Stone* finding of nonseverity and because there was "absolutely no evidence" that emotional distress rendered the claimant unable to work).

To summarize, even though the ALJ's step two articulation of various severity standards initially created ambiguity, a review of the record as a whole reveals that the ALJ applied the proper *Stone* severity standard in evaluating Morris' cervical disc protrusions with spondylosis, bilateral cervical radiculitis, and chronic lumbar myofascial pain. Accordingly, the Court disagrees with Morris' argument in her first issue that the ALJ failed to consider all of her vocationally significant impairments and finds that remand is inappropriate on these grounds.[13]

## B. RFC Assessment

Morris' second and third issues both assert flaws in the ALJ's RFC assessment. Morris argues in her second issue that the RFC assessment is unsupported by competent medical findings or opinion evidence, and she argues in her third issue that the ALJ made an improper adverse credibility finding relating to her own testimony regarding her limitations. The Court will first address the credibility issue, followed by the evidentiary issue.

---

[13] Once again, the Court wants to make clear that it is not conducting a "harmless error" analysis. Instead, as instructed in *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986), the Court will not recommend remand simply because the ALJ did not use "magic words" or cite to *Stone*. Remand is not required when it is clear, as in this case, that the ALJ applied the correct legal standard throughout even though the ALJ's reference to the *Stone* standard was ambiguous at best.

### 1.    Credibility

In his RFC determination, the ALJ considered Morris' pain and symptoms and evaluated their effects on her functioning. He recounted Morris' testimony at the hearing about her abilities and then stated as follows:

> Although the claimant's testimony is construed as indicating that she is incapable of performing any type of work activity, I find her testimony is not supported by the record, thereby impugning her credibility relating to her subjective complaints: she would not continue to nullify the treatment regimen if she were as limited as alleged. Therefore, I will consider only subjective complaints considered credible only to the extent that they are supported by the evidence of record as summarized within the text of this Decision. (Tr. 19.)

Morris challenges this credibility finding by the ALJ. Morris contends that there is no evidence that she has not been fully compliant with her treatment, so the ALJ did not articulate credible and plausible reasons for rejecting her subjective complaints. Morris argues that the ALJ's credibility finding is flawed and, because the credibility assessment affected the ALJ's RFC assessment, the RFC assessment is not supported by substantial evidence. (Pl.'s Br. 17.)

Morris contests the ALJ's statement that she "continue[d] to nullify the treatment regimen," and the Commissioner does not point to evidence in the record of Morris' noncompliance with treatment, so it is somewhat unclear what the ALJ considered in coming to this particular conclusion. Nevertheless, after considering the entirety of the ALJ's decision, the Court determines that the ALJ properly considered all of the available evidence in evaluating the intensity and persistence of Morris' symptoms. The Court further determines that the ALJ adequately articulated his reasons for finding that Morris' testimony to the effect that she was incapable of performing any type of work activity was not credible.

When medical evidence shows that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, including pain, the ALJ

then must evaluate the "intensity and persistence" of the claimant's symptoms to determine how the symptoms limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1); *see also* SSR 96-7p, 61 Fed. Reg. 34483, 34484 (July 2, 1996). The ALJ must consider all of the available evidence, including the claimant's history; signs and laboratory findings; and statements from the claimant, treating or nontreating sources, or other persons about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(c)(1). The ALJ may consider various factors relevant to a claimant's credibility, including the claimant's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, that the claimant receives or has received for relief of pain or other symptoms; any measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *Id.* § 404.1529(c)(3). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 61 Fed. Reg. at 34486.

In his decision, the ALJ analyzed Morris' own testimony regarding her symptoms and stated that he had evaluated the credibility of her statements based on consideration of the entire case record. (Tr. 19.) He noted that Morris testified at the February 8, 2010 hearing that she lived alone and spent her time mostly watching television. She said that her children and grandchildren did her household chores, yard chores, and grocery shopping for her, and that her sister-in-law drove her to her medical appointments. Morris testified that she was unable to perform any activities due to numbness in her hands affecting her ability to grasp items or write.

19

Morris stated that she could not hold her head upright for long periods of time, so she frequently would lie down. (Tr. 19.)

On the other hand, the ALJ also noted that Morris had completed a form reporting that she "makes coffee, tends a dog, prepares meals, picks up clothing, does light housework, checks the mail, drives a vehicle, shops at a grocery store, visits with relatives in person or by telephone, watches television, and reads."[14] (Tr. 20, 129–135.) The ALJ could appropriately consider any lack of consistency in Morris' statements in judging her credibility. *See* SSR 96-7p, 61 Fed. Reg. at 34486 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.") Also, as stated above, the ALJ observed in his discussion of the medical evidence that Morris told Dr. Rosenstein at her November 2, 2009 exam that her medications helped to lessen her pain. (Tr. 18, 232.)

The ALJ also stated that, "[a]lthough [Morris] may experience some degree of pain or discomfort at times of overexertion, even a moderate level of pain is not, by itself, incompatible with the performance of certain levels of sustained work activity." (Tr. 18.) The ALJ further observed that the record contained no objective signs of a totally incapacitating impairment and that no treating physician had documented a medically determinable impairment that would prevent Morris from engaging in substantial work activity. (Tr. 18, 20.)

Thus, the Court concludes that, on the whole, the ALJ's decision sufficiently articulates the reasons for his credibility finding and reflects that he appropriately considered all of the

---

[14] This form is undated, but Morris' statements are similar to statements that Morris made to a mental status consultative examiner on March 25, 2009, in which she said that her typical morning activities were making coffee, taking the dog outside, and watching television. (Tr. 198.) She could drive a car, but not for long distances due to the need to change postures "every 20–30 minutes." (Tr. 198.) She stated that she could run various errands but could not "lift heavy objects due to grip strength and grip-induced pain." (Tr. 198.) Morris "stated she 'used to like to make candles, but I can't do that any more due to the lifting' and laughed[,] 'candles are very heavy.'" (Tr. 198.) She groomed on a daily basis without problems. (Tr. 198.)

available evidence, including Morris' history, medical signs and findings, and statements, in assessing the credibility of Morris' contentions about how her symptoms affected her capacity for work. *See* 20 C.F.R. § 404.1529(c)(1). Accordingly, the ALJ did not err in discounting Morris' credibility and considering her subjective complaints only to the extent that they were supported by objective evidence in the record.

### 2. State Agency Consultant's Opinion

In her second issue, Morris challenges the finding that she can perform light work with limitations including "no constant use of the hands" because there is no medical or opinion evidence in the record establishing that she can use her hands on a less-than-constant basis. (Pl.'s Br. 12.) Morris argues that the ALJ's determination that she can use her hands on a less-than-constant basis is "sheer speculation" and, thus, is not supported by substantial evidence. (Pl.'s Br. 14.)

A state agency medical consultant's physical RFC assessment dated April 2, 2009, included the medical consultant's opinion that Morris had no manipulative limitations in terms of reaching, handling, fingering, and feeling. (Tr. 220.) Morris argues that this assessment did not consider all significant medical evidence because she was not diagnosed with her disc protrusions and radiculitis until the CT scan on her cervical spine was performed on October 22, 2009—some six months after the state agency consultant's RFC opinion. (Pl.'s Br. 13.) Morris contends that, had the state agency consultant had information about these diagnoses and medical exam findings of patchy hypesthesia in Morris' upper extremities, the state agency consultant's opinion regarding manipulative limitations may have been different. (Pl.'s Br. 13.)

However, as explained below, the medical records contain substantial information regarding Morris' complaints of upper-extremity numbness and weakness even before the

diagnoses of disc protrusions and radiculitis. Further, although the medical records both before and after these diagnoses include Morris' reports of upper-extremity weakness, numbness, tingling, and decreased sensation, they do not contain findings of any functional limitations related to these diagnoses. Accordingly, Morris has not shown that the state agency consultant's opinion would have been different had he reviewed information about these new diagnoses.

### a.    Relevant Medical Evidence Available to State Agency Consultant

As least as early as December 11, 2006, Morris was complaining to Dr. Linder of "generalized weakness throughout the right hand," although she denied "any upper extremity paresthesias."[15]   (Tr. 182.)   Dr. Linder observed no muscle atrophy or vasomotor changes throughout the upper extremities. Motor, sensory, and reflex screening of the upper extremities revealed no focal deficits. (Tr. 182.) Despite Morris' complaint of right-hand weakness, Dr. Linder did not record that she observed any upper-extremity limitations related to this complaint. Instead, Dr. Linder recommended that Morris continue her part-time jobs as a real estate inspector and a dry cleaning employee as well as her home exercise program. (Tr. 182–83.)

At an October 22, 2007 exam with Dr. Linder, Morris reported "numbness and tingling throughout the upper extremities, especially in the left upper extremity and elbow," as well as "diffuse, intermittent weakness throughout the left upper extremity." (Tr. 186.) Dr. Linder observed no muscle atrophy or vasomotor changes throughout the upper extremities. (Tr. 186.) Motor, sensory, and reflex screening of the upper extremities revealed no focal deficits, although Morris reported "decreased sensation to light touch and pinprick diffusely throughout the left upper extremity." (Tr. 187.) Again, Dr. Linder did not record that she observed any upper-extremity limitations related to Morris' complaints of numbness, tingling, and weakness but

---

[15] Paresthesia is "[a]n abnormal sensation, such as of burning, pricking, tickling, or tingling." *Paresthesia, in Stedman's Medical Dictionary* (27th ed. 2000), *available at* STEDMANS 299220 (Westlaw).

instead recommended that Morris continue her part-time jobs as a real estate inspector and a dry cleaning employee as well as her home exercise program. (Tr. 186–87.)

At the March 24, 2008 exam with Dr. Linder, Morris reported that she had stopped working after Dr. Linder changed her medication regimen at her prior appointment in accordance with the peer review finding that Morris should be weaned off some of her medications (i.e., trazodone, Flexeril, and Effexor). (Tr. 188.) Morris reported "an increase in pain with activity since adjusting her medications" and claimed that she could no longer work at her real estate inspector and dry cleaning jobs. (Tr. 188.) Morris reported "numbness and tingling throughout the upper extremities, especially in the left upper extremity and elbow." (Tr. 188.) Dr. Linder observed no muscle atrophy or vasomotor changes throughout the upper extremities. (Tr. 188.) Motor, sensory, and reflex screening of the upper extremities revealed no focal deficits, although Morris "continue[d] to report decreased sensation to light touch and pinprick diffusely throughout the left upper extremity." (Tr. 189.) Dr. Linder did not record that she observed any upper-extremity limitations related to Morris' complaints of numbness, tingling, and decreased sensation.

At an August 25, 2008 exam with Dr. Linder, Morris reported "numbness and tingling throughout the upper extremities, especially in the left upper extremity and elbow, which [was] unchanged." (Tr. 190.) Dr. Linder observed no muscle atrophy or vasomotor changes throughout the upper extremities. (Tr. 190.) Motor, sensory, and reflex screening of the upper extremities revealed no focal deficits, although Morris "continue[d] to report decreased sensation to light touch and pinprick diffusely throughout the left upper extremity." (Tr. 190.) Dr. Linder did not record that she observed any upper-extremity limitations related to Morris' complaints of numbness, tingling, and decreased sensation.

At a March 9, 2009 exam with Dr. Linder, Morris reported "numbness and tingling throughout both hands on a chronic basis, [which varied] depending upon the position of her upper extremities," although she denied any upper-extremity weakness. (Tr. 194.) Dr. Linder observed no muscle atrophy or vasomotor changes throughout the upper extremities. Motor and reflex screening of the upper extremities revealed no focal deficits, although Morris "continue[d] to report decreased sensation to light touch and pinprick diffusely throughout the left upper extremity." (Tr. 194.) Dr. Linder did not record that she observed any upper-extremity limitations related to Morris' complaints of numbness, tingling, and decreased sensation.

### b.   Relevant Medical Evidence After State Agency Consultant's Opinion

As detailed above, Dr. Rosenstein, a neurological surgeon, examined Morris on September 28, 2009, and ordered x-rays and a CT scan of Morris' cervical spine. At this exam, Dr. Rosenstein noted Morris' reports of "stabbing pain that radiate[d] into her arms" and "numbness in her arms." (Tr. 228.) Dr. Rosenstein's motor exam revealed "5/5 strength in all upper extremity muscle groups. Sensory exam reveal[ed] patchy hypesthesia to pin over both hands. Reflexes are 1 and symmetric." (Tr. 229.) Dr. Rosenstein's impressions were neck and bilateral trapezial pain, bilateral arm numbness, and status post cervical fusion, but he did not record that he observed any upper-extremity limitations related to Morris' complaints of numbness and pain in her arms. (Tr. 229.)

Also as stated above, Dr. Rosenstein diagnosed Morris' disc protrusions and disc narrowing with anterolisthesis on November 2, 2009. (Tr. 233.) Dr. Rosenstein's exam revealed the following: "Deep tendon reflexes are 1 and symmetric bilaterally. Motor strength is 5/5 in all upper extremity muscle groups. The patient has diffuse hypoesthesia to pin over the hands bilaterally." (Tr. 232.) Although Dr. Rosenstein recommended electromyography of the upper

extremities to evaluate Morris' upper-extremity symptoms further, he did not record that he observed any upper-extremity limitations related to Morris' complaints of numbness and pain in her arms. (Tr. 233.)

Next, at the December 7, 2009 exam, Dr. Rosenstein diagnosed Morris with bilateral cervical radiculitis and repeated his diagnoses of disc protrusions and disc narrowing with anterolisthesis. (Tr. 236.) Dr. Rosenstein noted that the request for electrophysiological studies of Morris' upper extremities had been denied, stating, "This is going to an [independent review organization.]" (Tr. 236.) Dr. Rosenstein's exam noted that "motor strength is 5/5 in all the major muscle groups. There is no myelopathy on examination. Deep tendon reflexes are 1 and symmetric. . . . There is patchy hypesthesia in the upper extremities bilaterally." (Tr. 236.) Although Dr. Rosenstein stated that he was awaiting Morris' electrophysiological studies and outcome of the independent review, he still did not record that he observed any upper-extremity limitations. (Tr. 237.) Morris did not submit any electrophysiological study results for inclusion in the medical record.

### c. Evidence Supporting ALJ's RFC Determination

The term "residual functional capacity assessment" describes an ALJ's finding about the ability of an individual to perform work-related activities. *See* SSR 96-5p, 61 Fed. Reg. 34471, 34473 (July 2, 1996). The RFC assessment is based upon "*all* of the relevant evidence in the case record," including, but not limited to, medical history, medical signs, and laboratory findings; the effects of treatment; and reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations. SSR 96-8p, 61 Fed. Reg. 34474, 34477 (July 2, 1996) (emphasis in original); *see also* 20 C.F.R. § 404.1545(a)(1). In determining the credibility of the claimant's statements regarding the functional effects imposed by a

claimant's impairments, the ALJ must consider the entire record. SSR 96-7p, 61 Fed. Reg. at 34484.

The medical evidence shows that Morris had been complaining to her doctors since at least December 2006 of weakness in her hands, and since October 2007 of numbness and tingling in her upper extremities, yet Morris points to no medical records containing doctors' observations or findings of actual limitations related to these symptoms. The medical evidence obtained after the April 2009 state agency consultant's opinion included x-rays and films leading to Dr. Rosenstein's impressions of disc protrusions with spondylosis and bilateral cervical radiculitis. But even these new records contained findings by Dr. Rosenstein regarding Morris' muscle strength, sensory abilities, and reflexes that did not substantially conflict with Dr. Linder's earlier observations. Furthermore, these new records contained no observations or findings of any actual limitations related to these diagnoses.

Nevertheless, Morris speculates that these impressions, together with Dr. Rosenstein's exam findings of patchy hypesthesia, "may" have caused the state agency consultant to render a different opinion relating to Morris' ability to use her hands. (Pl.'s Br. 13.) However, again, the mere diagnosis of an impairment does not establish its severity. *See Ranes*, 2009 WL 2486037, at *3. Plaintiff points to no medical evidence of any different or heightened effect that Morris' newly diagnosed impairments had on her ability to use her hands, as compared to her prediagnosis abilities, so the state agency consultant's opinion would not necessarily have assessed more limitations based on a mere diagnosis alone.

Morris next complains that the ALJ's determination that she can use her hands on a less-than-constant basis is "sheer speculation and is not based upon any medical evidence or medical opinion" and, thus, is not supported by substantial evidence. (Pl.'s Br. 14.) Citing *Ripley v.*

*Chater*, 67 F.3d 552, 557 (5th Cir. 1995), Morris asserts that the ALJ impermissibly relied on his own medical conclusion as to her ability to use her hands. (Pl.'s Br. 13.) It is true that the record contains no medical source stating that Morris requires "no constant use of the hands"; in fact, the state agency consultant's opinion actually imposes no limitation on use of the hands at all. The absence of such a statement, however, does not make the record incomplete. *See id.*

In *Ripley*, the record contained no medical source statement regarding the effect that Ripley's condition had on his ability to work, so the only evidence on this issue came from Ripley's own testimony. *Id.* The Fifth Circuit held that, without reports from qualified medical experts regarding the effects of Ripley's condition on his ability to work, the ALJ's determination that Ripley could perform sedentary work was not supported by substantial evidence. *Id.* Here, however, the record contains opinion evidence from a state agency consultant regarding Morris' manipulative abilities as well as medical evidence from treating physicians showing that, although Morris had hypesthesia of the upper extremities, she also had motor, sensory, and reflex exams consistently showing no focal deficits; symmetrical reflex function; and 5/5 muscle strength in her upper extremities. (Tr. 182, 187, 189, 190, 229, 232, 236.)

Furthermore, the ALJ had before him Morris' own testimony regarding her abilities. As stated above, an ALJ may consider reports of daily activities and lay evidence in formulating a claimant's RFC. SSR 96-8p, 61 Fed. Reg. at 34477; *see also* 20 C.F.R. § 404.1545(a)(3) (providing that the Commissioner considers medical evidence as well as "descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons"). Morris' own descriptions of her limitations, both at the hearing and recorded in the

medical records, provided evidence of manipulative limitations that the ALJ could consider to the extent that he found those descriptions credible.

The ALJ stated that he had considered the state agency consultant's opinion and that he "generally endorse[d]" the determinations by state agency physicians. The ALJ did not wholly accept the state agency consultant's opinion, however, but instead accommodated for Morris' self-described manipulative limitations—to the extent that he found them credible—by adding the restriction of "no constant use of the hands." Therefore, the ALJ's RFC determination that Morris could use her hands on a less-than-constant basis was based on a comprehensive evaluation of all the relevant evidence supporting or discrediting Morris' claims of limitations, as he was required to do, and was supported by substantial evidence.[16] *See Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001) (stating that the task of weighing the evidence is the province of the ALJ, and the weight to be given competing pieces of evidence is within the ALJ's discretion).

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the

---

[16] Morris also complains of the ALJ's noting that the vocational expert testified "that a person limited to sedentary work with less than occasional hand/fingering could perform the job of surveillance system monitor." (Tr. 21.) Morris claims that most sedentary jobs require bilateral manual dexterity, so a limitation to unskilled sedentary work with an additional loss of bilateral manual dexterity would warrant a finding of disability. (Pl.'s Br. 14–15.) However, the ALJ found that Morris was able to perform light work with restrictions, not sedentary work. Because Morris has not shown that the ALJ's light-work RFC assessment was unsupported by substantial evidence, any argument that she cannot perform sedentary work is inapposite.

party has been served with a copy of this document.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(b)(1).  Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge.  *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**ORDER**

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until September 18, 2012, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation.  It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED September 4, 2012.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE